CARE RISK RETENTION GROUP, Appellee,

v.

MARTIN; Burnett et al., Appellants.

[Cite as *Care Risk Retention Group v. Martin,* 191 Ohio App.3d 797, 2010-Ohio-6091.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. CA 23749.

Decided Dec. 10, 2010.

James Oliphant and Kendall Verrett Shaw, for appellee.

Dwight D. Brannon, for appellants.

FAIN, Judge.

{¶ 1} Intervening defendants-appellants, Iva Burnett, individually and as executor of the estate of Floyd Burnett, Rebecca Osborn, and Shawn Burnett, appeal from a summary judgment rendered in favor of plaintiff-appellee, CARE Risk Retention Group ("CARE Risk") in a declaratory-judgment action. CARE Risk filed the action to obtain a declaration that its policy of medical-malpractice insurance covering defendant Derrick Martin, M.D., is void ab initio.[1] The Burnetts had previously filed a medical-malpractice action against Dr. Martin,

---

1. For purposes of convenience, the parties will be referred to as the Burnetts, CARE Risk, and Dr. Martin.

and intervened in the declaratory-judgment action in order to obtain a declaration that the policy of insurance covers their claims against Dr. Martin.

{¶ 2} The Burnetts contend that the trial court erred in concluding that certain statements in Dr. Martin's application for insurance are warranties rather than representations. The Burnetts also contend that the trial court erred in refusing to allow them to intervene prior to the hearing on Dr. Martin's request for a preliminary injunction.

{¶ 3} We conclude that the trial court erred in rendering summary judgment in favor of CARE Risk. Dr. Martin's statements in the application of insurance are representations, not warranties that void the policy ab initio. There are also genuine issues of material fact regarding whether Dr. Martin's representations were intentionally false or were recklessly or negligently made without reasonable grounds to believe the statements were true. We further conclude that the issue of alleged error in delaying a ruling on the Burnetts' motion to intervene is moot.

{¶ 4} Accordingly, the judgment of the trial court is reversed, and this cause is remanded to the trial court for further proceedings.

## I

{¶ 5} Dr. Martin is a board-certified general surgeon who has been performing bariatric surgery since 1999. Between 2002 and 2003, Dr. Martin's practice became entirely dependent on bariatric surgery, and he performed 300 to 400 surgeries a year, primarily in Middletown Regional Hospital, Kettering Sycamore Medical Center, and Miami Valley Hospital.

{¶ 6} In the summer of 2005, Dr. Martin operated on Floyd Burnett, who developed a postoperative leak. The leak was immediately repaired, and Burnett was hospitalized for 21 days, as opposed to the typical stay of three to five days. After being discharged to the care of a home nurse, Burnett was readmitted to the hospital, and died of a massive coronary, less than a month after surgery. At the time, Dr. Martin was insured against medical-malpractice liability by ProAssurance.

{¶ 7} In October 2005, Dr. Martin received a letter from attorney Dwight Brannon, who stated that he represented "Floyd C. Burnett, deceased." Brannon's letterhead indicated that he is board-certified as a civil trial advocate/specialist. Brannon enclosed a release and asked Dr. Martin to provide him with a copy of the entire medical record for treatment of Burnett, copies of all tests ordered, all physical-therapy records, and a copy of any itemized statement of services rendered to Burnett.

{¶ 8} Brannon wrote Dr. Martin again in November 2005, acknowledging receipt of the records, and requesting assurance that Dr. Martin had no other records or paperwork. Neither letter stated that Brannon or the Burnetts intended to pursue litigation against Dr. Martin, and neither letter was a 180–day letter. A "180–day letter" is a letter sent in accordance with R.C. 2305.113(B)(1) that gives malpractice claimants an additional 180 days to file suit if they send the subject of the potential suit written notice of the claim within the one-year limitations period outlined in R.C. 2305.113(A).

{¶ 9} Dr. Martin was aware of Brannon's records request and carefully scrutinized the letters from Brannon, because he already had a bona fide insurance company in place (ProAssurance). Dr. Martin did not notify ProAssurance of the claim, because he did not think the claim had any merit, and did not think the letter was a litigation letter. He indicated that his office may have notified ProAssurance orally, but was not sure, as there was no record of a call. Dr. Martin also believed that Brannon's letter accompanied other documents indicating that the request was in connection with probating Burnett's will. Dr. Martin did not, however, provide the trial court with any such documents.

{¶ 10} In November 2005, Dr. Martin spoke to Bill Patton of the Cunningham Group, an insurance agency, about obtaining bariatric-malpractice coverage. After considering several insurers, Dr. Martin selected CARE Risk Retention Group, which was formed in 2003 pursuant to the Federal Liability Risk Retention Act. This act allows homogeneous groups of individuals to band together to buy liability insurance.

{¶ 11} Dr. Martin read the CARE Risk application before completing it in February 2006. His then-existing malpractice insurance was set to expire in July 2006. On his application for professional-liability insurance with CARE Risk, Dr. Martin answered the following question in the negative:

{¶ 12} "# 34. ARE YOU AWARE OF ANY ACTS, ERRORS, OMISSIONS OR CIRCUMSTANCES WHICH MAY RESULT IN A MALPRACTICE CLAIM OR SUIT BEING MADE OR BROUGHT AGAINST YOU?" (Capitalization sic.)

{¶ 13} The application further states:

{¶ 14} "WARRANTY: It is warranted to the insurer that the information contained herein is true and that it shall be the basis of the policy of insurance and deemed incorporated herein. Should the Company evidence its acceptance of the application by the issuance of a policy, I/We hereby authorize the release of claim information from any prior insurer to the insurer and to the Underwriting Manager for the Insurer.

{¶ 15} "PLEASE REVIEW THE POLICY CAREFULLY. Except to such extent as may be provided otherwise in the policy, the policy for which application is made is limited to ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED while the policy is in force. Furthermore, the policy includes the cost of defense of claims within the policy limit which means that the Policy limit available to pay a claimant WILL be reduced by the cost of investigation, defense, and other expenses involved in the defense. The applicant, by signing this application below confirms (his/her) understanding of all provisions represented by the Insurer." (Capitalization sic.)

{¶ 16} Dr. Martin also signed two other documents that were included with the application. One was an application for prior-acts coverage. In this application, Dr. Martin responded negatively to the following question:

{¶ 17} "Item 3. Do you have knowledge or information of any potential or actual claim or suit that may be brought against you or of any incidents? * * * If 'YES', attach a full and complete explanation."

{¶ 18} In addition, the application for prior-acts coverage contains the following statements:

{¶ 19} "I declare that I know of no potential or actual claims, suits or incidents presently pending which have not been reported to my previous carrier(s). I understand that 'Carrier' also means 'Insurer.'

{¶ 20} " * * *

{¶ 21} "I HEREBY DECLARE THAT I HAVE READ THE ABOVE APPLICATION AND THAT ALL STATEMENTS MADE IN THIS APPLICATION ARE TRUE, MATERIAL AND COMPLETE. I UNDERSTAND THAT IF PRIOR ACTS COVERAGE IS OBTAINED BY FRAUD, MATERIAL MISREPRESENTATION OR OMISSION, IT IS VOID." (Capitalization sic.)

{¶ 22} The final document that Dr. Martin was required to sign is a Statement of No Known Claims/Losses. This document states as follows:

{¶ 23} "My signature below confirms that:

{¶ 24} "1. I have no known losses or claims that have not been reported to my prior insurance carrier.

{¶ 25} "2. I have no knowledge or information relating to a MEDICAL INCIDENT which could reasonably result in a claim, that has NOT been reported to a prior insurance carrier.

{¶ 26} "3. I have no knowledge of ANY REQUEST FOR MEDICAL RECORDS which might result in a claim." (Capitalization sic.)

{¶ 27} Dr. Martin testified that when he signed the application, he had not received any information defining the meaning of a "medical incident" that could reasonably result in a claim. He stated that many medical incidents occur, such as high glucose, low potassium, renal failure, leaks, and wound infections and that Burnett's death was not related to his surgery. Dr. Martin also testified that when he signed the application, he was not aware of any request for medical records that might result in a claim. He indicated that in his 23 years of practice, receipt of a 180–day letter had always been the standard vehicle for a request for medical records from an attorney indicating that he was being considered as a possible defendant in a malpractice action.

{¶ 28} Before the policy was issued, the insurance agent, Patton, informed CARE Risk that two malpractice claims had been asserted against Dr. Martin. Both were closed, and no payment was made. CARE Risk did further investigation and determined that there were no other actions against Dr. Martin. Subsequently, in April 2006, CARE Risk issued Policy of Insurance PPL3406031300048 to Dr. Martin as the named insured. The term was from April 11, 2006, to April 11, 2007. The policy is a claims-made policy that does not cover any occurrences happening prior to July 11, 2003. The policy covers only claims for professional services rendered after the retroactive date in the declarations (July 11, 2003) that were first made against the insured and reported to CARE Risk during the policy period or any supporting period.

{¶ 29} Under the heading General Terms, Conditions and Exclusions, the policy conditioned the agreements of CARE Risk to defend and indemnify on the following:

{¶ 30} "In consideration of the premium and in reliance upon the statements made in the **Application**, which is made a part of and deemed attached to this **Policy** and which you and the **Insureds** warrant as being true, complete, and accurate, and subject to the Declarations and the limitations, conditions, provisions and other terms of this **Policy** * * *." (Boldface sic.)

{¶ 31} The policy defines "the Application" as "all applications, including attachments and submitted materials, for this **Policy** or for any policy of which this **Policy** is a renewal or replacement. All such applications, attachments and materials are deemed attached to and incorporated into this Policy. YOU WARRANT THAT ALL SUCH INFORMATION IS TRUE, COMPLETE AND ACCURATE." (Boldface and capitalization sic.)

{¶ 32} Section 11 of the policy is entitled "Representations and Severability," and states:

{¶ 33} "In issuing this **Policy**, we relied upon the statements and representations in the Application. The **Insureds** warrant that all such statements and

representations are true and deemed material to the acceptance of the risk or the hazard assumed by us under this **Policy**." (Boldface sic.)

{¶ 34} In the coverage section, CARE Risk agreed that it would do the following:

{¶ 35} "[P]ay all money damages that an **Insured** becomes legally obligated to pay as a result of a **Claim** first made against such **Insured** during the **Policy Period** and reported to us in accordance with the terms of this **Policy** during the **Policy Period** on account of an **Adverse Event:**

{¶ 36} "Provided always that such **Adverse Event** takes place in the **Coverage Territory** subsequent to the **Retroactive Date** stated in the Declarations and happens:

{¶ 37} "1. During the **Policy Period;** or

{¶ 38} "2. Prior to the **Policy Period** provided that on the effective date of this **Policy** the **Insured:**

{¶ 39} "(i) had no knowledge of such **Adverse Event;** or

{¶ 40} "(ii) could not reasonably have expected such **Adverse Event** to result in a **Claim,** whether baseless or not, and there is no prior policy or policies which provide insurance for such liability or **Claim** resulting from such **Adverse Event,** whether or not the available Limits of Liability of such prior policy or policies are sufficient to pay any liability, **Defense Costs** or **Claim,** or whether or not the deductible provisions and amount of such prior policy or policies are different from this **Policy,** and whether or not such prior policy or polices are collectible in whole or in part." (Boldface sic.)

{¶ 41} An "Adverse Event" is defined as "any act, error or omission in the furnishing of **Professional Services** as a qualified physician in the normal course of activity as a qualified physician." (Boldface sic.) "Professional Services" is defined as "the rendering or failure to render health care, treatment or services, including surgery, within the **Insured's Profession** that the **Insured** provides to a patient; or, within a doctor-patient relationship; or, as a consultant thereto." (Boldface sic.)

{¶ 42} In July 2006, the Burnetts filed an action against Dr. Martin and Martin Surgical Associates, L.L.C. (an additional insured on the policy), alleging that Dr. Martin had committed negligence and medical malpractice in connection with gastric surgery performed on Lloyd Burnett in August 2005. Dr. Martin notified his prior carrier of the claim, but coverage was denied. CARE Risk was then notified of the claim. After investigating, CARE Risk concluded that Dr. Martin had prior knowledge of the claim. CARE Risk entered a defense for Dr. Martin on the claim, but issued a reservation of rights, stating that further investigation

would be done. After learning that Martin had two other prior incidents that had not been disclosed, CARE Risk canceled Dr. Martin's policy in December 2006, on the basis of alleged material misstatements. However, after discussing the matter with Dr. Martin's attorney, CARE Risk agreed to reinstate the policy and not renew at the end of the term. CARE Risk also continued to defend Dr. Martin, pending the filing of a declaratory-judgment action and the outcome of that action.

{¶ 43} In early May 2007, CARE Risk filed a declaratory-judgment action against Dr. Martin and Martin Surgical Associates, L.L.C., alleging that Dr. Martin's material misrepresentations had rendered the policy of insurance void. Subsequently, in late May 2007, the Burnetts filed a motion to consolidate the case with their pending medical-malpractice action, a motion to intervene, a motion for summary judgment, and a motion to strike portions of the complaint. The motion for summary judgment was based on, among other things, the contention that Dr. Martin's statements in the applications were not warranties that could result in the policy's being void.

{¶ 44} In June 2007, Dr. Martin filed a motion for preliminary injunction regarding CARE Risk's refusal to allow him to purchase extended coverage after CARE Risk decided not to renew the policy. The trial judge who had been assigned to hear the preliminary-injunction motion overruled the Burnetts' motion to consolidate and indicated that the issue of intervention would be decided by the trial judge who would be replacing a formerly assigned judge.

{¶ 45} A preliminary-injunction hearing was held in December 2007. The Burnetts were not yet part of the case, but Dr. Martin appeared with counsel, and testified about the application procedure. CARE Risk also presented testimony from the person who was the director of underwriting at all relevant times, and who had participated in the decisions about Dr. Martin's coverage. The trial court then issued a decision in March 2008, overruling Dr. Martin's motion for a preliminary injunction on the issue of extended coverage. The trial court concluded that even if CARE Risk had improperly denied tail coverage, Dr. Martin had an adequate remedy through payment of damages, because Dr. Martin had testified that he could obtain other tail coverage, but felt that the coverage was too expensive. The trial court also added that it concluded that Dr. Martin's likelihood of success on the merits was minimal. Based on the testimony at the hearing, the court concluded that Dr. Martin knowingly made false representations regarding the statement that he had no knowledge of any request for medical records that might result in a claim. The court noted that the letters requesting medical records reasonably put Dr. Martin on notice that the request might result in a claim, particularly since Burnett died three weeks after bariatric surgery. Because a knowing false warranty rendered the policy void ab initio,

CARE Risk had no contractual obligation to honor the request for extended tail coverage.

{¶ 46} Dr. Martin subsequently filed a motion for judgment notwithstanding the verdict or a new trial, and/or relief from judgment under Civ.R. 50(B), 50(A), and/or 60(B). Among other things, Dr. Martin argued in the motion that the trial court erred in treating the representations as warranties, because a warranty cannot be a statement regarding an insured's knowledge of a fact; a warranty can only be a statement regarding whether a statement is true or not.

{¶ 47} In late March 2008, the Burnetts filed a renewed motion to intervene and motion for new trial and or motion for relief from judgment under Civ.R. 59 and/or 60(B). In discussing these motions, the Burnetts adopted Dr. Martin's previously filed memorandum in whole. Subsequently, in April 2008, the trial court overruled the pending motions for a new trial and for relief from judgment. The court reconsidered all the matters and concluded that the statement in question was a warranty. The court also concluded that Dr. Martin, in all likelihood, knew the statement was untrue.

{¶ 48} In May 2008, the same judge deferred any decision on the pending motion to intervene. The judge noted that he had only been assigned to hear the preliminary-injunction motion and that the case had now been assigned to a different judge.

{¶ 49} The Burnetts filed a notice of appeal from various decisions, including the denial of their motion to consolidate, denial of the motion for preliminary injunction, denial of relief from judgment, and deferral of a ruling on the motion to intervene. That appeal was dismissed for lack of a final, appealable order in October 2008. See *CARE Risk Retention Group v. Martin* (Oct. 31, 2008), Montgomery App. No. 22771.

{¶ 50} In the interim, the trial court permitted the Burnetts to intervene in the declaratory-judgment action. The Burnetts then filed an answer and counterclaim for declaratory judgment. After the case was referred to a magistrate for trial, both the Burnetts and CARE Risk filed motions for partial summary judgment. The Burnetts again raised the argument that Dr. Martin did not breach warranties in his application for insurance.

{¶ 51} The matter was first considered by a magistrate, who concluded that the statements in the application were incorporated into the policy and that the policy was void due to Dr. Martin's misstatements. The magistrate concluded therefore that the policy was void ab initio and that judgment should be rendered in favor of CARE Risk. The Burnetts then filed objections to the magistrate's decision.

{¶ 52} After reviewing the matter, the trial court approved and adopted the facts in the magistrate's decision. The court held that the language of the

application and policy clearly provide that any misstatements by Dr. Martin would render the policy void ab initio. The court rendered judgment in favor of CARE Risk against Martin, declaring that the professional-liability policy issued to Dr. Martin and Martin Surgical Associates was void ab initio. The court also rendered judgment in favor of CARE Risk on the counterclaim for declaratory judgment filed by Dr. Martin, Martin Surgical Associates, and the Burnetts. And finally, the court added a Civ.R. 54(B) certification, finding no just reason for delay.

{¶ 53} The Burnetts appeal from the judgment of the trial court. Dr. Martin did not file a notice of appeal and has not participated in the appeal.

## II

{¶ 54} The Burnetts' first assignment of error is as follows:

{¶ 55} "The trial court erred in granting summary judgment in favor of the insurance company based on an improper finding of a breach of warranty."

{¶ 56} Under this assignment of error, the Burnetts contend that the trial court erred in rendering summary judgment in favor of CARE Risk, because Ohio law provides that a representation about the personal knowledge or opinions of an insurance applicant cannot constitute a warranty capable of voiding an insurance policy. In support of this proposition, the Burnetts rely on *Legler v. U.S. Fid. & Guar. Co.* (1913), 88 Ohio St. 336, 103 N.E. 897, and *Heath v. Buckeye Union Ins. Co.* (Nov. 9, 1979), Lucas App. No. L 79–009, 1979 WL 207312.

{¶ 57} The standard for rendering summary judgment is as follows:

{¶ 58} "A trial court may grant a moving party summary judgment pursuant to Civ.R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." *Smith v. Five Rivers MetroParks* (1999), 134 Ohio App.3d 754, 760, 732 N.E.2d 422. "We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16.

{¶ 59} The legal standards applicable to the case before us are outlined in *Allstate Ins. Co. v. Boggs* (1971), 27 Ohio St.2d 216, 56 O.O.2d 130, 271 N.E.2d 855. In *Boggs,* the Supreme Court of Ohio noted:

{¶ 60} "Statements by an insured fall into two classes—those which constitute warranties, and those which constitute representations.

{¶ 61} "The consequences of a misstatement of fact by an insured are entirely different, depending on whether the statement is a warranty or a representation. If the statement is a warranty, a misstatement of fact voids the policy *ab initio*. However, if the statement is a representation, a mistatement by the insured will render the policy voidable, if it is fraudulently made and the fact is material to the risk, but it does not void the policy *ab initio*.

{¶ 62} "In the law of insurance, a representation is a statement made prior to the issuance of the policy which tends to cause the insurer to assume the risk. A warranty is a statement, description or undertaking by the insured of a material fact either appearing on the face of the policy or in another instrument specifically incorporated in the policy." Id. at 218–219, 56 O.O.2d 130, 271 N.E.2d 855, citing *Hartford Protection Ins. Co. v. Harmer* (1853), 2 Ohio St. 452.

{¶ 63} *Boggs* is generally interpreted as having established a two-pronged test for deciding if a misrepresentation or misstatement qualifies as a warranty. The first prong requires that the misrepresentation appear on the policy's face or be plainly incorporated into the policy. Under the second prong, the policy must plainly warn that a misstatement or misrepresentation renders the policy void from its inception. See, e.g., *Am. Family Ins. Co. v. Johnson*, Cuyahoga App. No. 93022, 2010-Ohio-1855, 2010 WL 1712240, ¶ 16; *State Farm Fire & Cas. Co. v. Davidson* (1993), 87 Ohio App.3d 101, 106, 621 N.E.2d 887; and *Horton v. Safe Auto Ins. Co.* (June 14, 2001), Franklin App. No. 00AP–1017, 2001 WL 664421.

{¶ 64} The Burnetts contend that Dr. Martin's statements are merely expressions of opinion or personal knowledge. The Burnetts contend that under *Legler* and *Heath*, insurers cannot require applicants to make warranties about their personal knowledge and belief. According to the Burnetts, statements of personal knowledge or belief are not statements of material fact and are not, therefore, warranties, because the statements necessarily involve an insured party's "interpretation" of facts.

{¶ 65} *Legler* is a per curiam opinion of the Supreme Court of Ohio. In *Legler*, one part of the policy stated that a surety bond would be void if the employer's written statement were found to be untrue. 88 Ohio St. at 337, 103 N.E. 897. Another provision provided that the bond was issued on the express understanding that the employer had no knowledge that the employee was a defaulter. Id. The Supreme Court of Ohio construed the provisions together and concluded that the parties had intended that the fact that the employee was a defaulter would be no defense to a suit on the bond if the employer did not know of the default and had answered truthfully, unless the employer's statements were intentionally false or were recklessly or negligently made without reasonable grounds to believe the statements were true. Id. at 338, 103 N.E. 897.

{¶ 66} Subsequently, in *Heath*, the Sixth District Court of Appeals cited *Legler* in a case involving automobile insurance coverage. *Heath v. Buckeye Union Ins. Co.* (Nov. 9, 1979), Lucas App. No. L 79–009, 1979 WL 207312. In *Heath*, a husband signed an application for auto insurance and stated that to the best of his knowledge and belief, no operator of the car had had any moving violations or accidents in the past three years. Id. at *2. As it happened, his wife had been in an auto accident about 15 minutes before the application was signed. Id. No evidence was presented to indicate that the husband knew about the accident when he signed the application.

{¶ 67} The Sixth District Court of Appeals concluded that a declaration of truth given to the best of the insured's knowledge and belief is not a warranty of the truth or accuracy of the facts stated in the application. Id. at *3. The Sixth District Court of Appeals noted that a statement "as to conditions and facts does not constitute a warranty unless the language of the policy, construed strictly against the insurer, requires such an interpretation." Id. The Sixth District Court of Appeals distinguished *Boggs* and other cases, because the applications in those cases "reveal clearly that warranties were unambiguously intended." Id. The court then cited *Legler* for the proposition that if an application is premised on the insured's knowledge at the time, it is not a basis for avoiding the insurer's obligations unless the statements are intentionally false, or recklessly or negligently made. Id.

{¶ 68} The issue is close, but after reviewing the cases, we conclude that *Boggs* is distinguishable from the case before us. *Boggs* also did not overrule *Legler*. *Boggs* controls situations in which an insured's statements "can" be the subject of a warranty. *Boggs* dictates how an insurance company can create a warranty by putting an insured on notice that what the insured is saying is a warranty that can void the policy. Nonetheless, if a statement is the type of statement that cannot, as a matter of law, constitute a warranty, then no amount of notice can make the statement a warranty.

{¶ 69} As the Burnetts point out, an example of this kind of statement occurred in *First Nat. Bank v. Hartford Fire Ins. Co.* (1877), 95 U.S. 673, 24 L.Ed. 563. In *Hartford*, the Supreme Court of the United States considered an insurance application that asked, among other things, for an estimate of the value of the insured buildings. The application stated that the applicant had given a full exposition of the facts regarding the value of the property, so far as they were known to the applicant and were material to the risk. In contrast, the policy stated that the application was part of the policy and was a warranty by the insured. In addition, the policy provided that any erroneous representation would render the policy void. Id. at 674, 24 L.Ed. 563. After the loss, the insurer found that the applicant had overestimated the value of the property. Id.

{¶ 70} The Supreme Court of the United States concluded that the application did not contain language notifying the insured, by fair construction, that he was assuming the strict obligations that the law attaches to a warranty. Id. at 675–676, 24 L.Ed. 563. The court concluded that the application covenanted "good faith on the part of the assured—nothing more; and, so far as it related to the value of the property, was not broken, unless the estimates by the assured were intentionally excessive." Id. at 676, 24 L.Ed. 563. The court contrasted this with statements in the policy making the insured stipulate for a warranty and voiding the policy if the insured made an erroneous misrepresentation or failed to make known any fact material to the risk. Id. In attempting to reconcile these provisions, the court observed that some questions asked of the insured related to items within his knowledge, or about which he might be asked to speak about with perfect accuracy. Id. at 677, 24 L.Ed. 563. In contrast, estimating the value of the property was only an expression of his opinion as to value and was a matter about which people could honestly differ. Id.

{¶ 71} The Supreme Court of the United States noted that the warranty in the policy could be construed as having been limited by the terms of the application, which would be the construction most consistent with the terms of the policy. Alternatively, the warranty could be considered as only relating to matters about which the insured had distinct knowledge, and not matters such as values, which depend on mere opinion. Id. at 687, 24 L.Ed. 563. The court refused to adopt either construction, holding:

{¶ 72} "[W]hen a policy of insurance contains contradictory provisions, or has been so framed as to leave room for construction, rendering it doubtful whether the parties intended the exact truth of the applicant's statements to be a condition precedent to any binding contract, the court should lean against that construction which imposes upon the assured the obligations of a warranty." Id. at 678–679, 24 L.Ed. 563.

{¶ 73} The CARE Risk application does indicate that Dr. Martin's statements are warranties, and the application for prior-acts coverage, which was incorporated into the policy, also indicates that a material misrepresentation or omission will render the policy void. Under Boggs, this would normally render the statements warranties, and the policy would be void ab initio if the statements are false. However, the statements request expressions of personal belief or opinion, rather than statements of fact. For example, Item 3 in the application for prior-acts coverage asks whether the applicant has knowledge or information of any potential claim that might be brought against him or of any incidents. Dr. Martin answered "no" to this question. Dr. Martin's explanation for this negative answer is that many "incidents" occur in the practice of medicine and that he could not reasonably be expected to disclose all of these incidents when

applying for insurance. Another question asks if Dr. Martin has knowledge of any request for medical records that might result in a claim. Dr. Martin also answered this question in the negative. By asking these questions, however, the insurance company is essentially attempting to have doctors perform the insurance company's role of assessing risk. The insurance company is also attempting to create a situation in which it can declare the policy void ab initio if a potential claim materializes but collect premiums if no potential claim surfaces. Shorter version: "We'll cover you if, and only if, you can assure us that there's nothing to cover."

{¶ 74} CARE Risk argues that Dr. Martin surely knew of an "incident," in view of Burnett's death, which was a serious occurrence. However, "incident" is too vague to support a warranty. The question also asks Dr. Martin's personal belief regarding whether something that occurred is an "incident."

{¶ 75} In subsection four of their argument, the Burnetts also contend that a genuine issue of material fact exists regarding whether Dr. Martin's statements were false. The Burnetts note that Dr. Martin alone can testify about his personal knowledge and the substance of his opinions when he applied for insurance. According to the Burnetts, resolving these issues requires a credibility determination, because Dr. Martin denied awareness of potential claims. CARE Risk responds by noting that Dr. Martin was not required to guarantee that a medical-malpractice action would not be filed against him—he was asked only to disclose facts or circumstances that might result in a claim. CARE Risk contends that Dr. Martin's credibility was not at issue and that in view of the facts, it is not plausible that a reasonable physician would fail to report the incident to its potential insurance carrier.

{¶ 76} We agree with the Burnetts. Whether Dr. Martin made a representation in bad faith is an issue for the trier of fact to decide. Under *Legler*, a defense to a suit on the insurance policy or bond is that an applicant's statements were intentionally false or were recklessly or negligently made without reasonable grounds to believe the statements were true. 88 Ohio St. at 338, 103 N.E. 897.

{¶ 77} The Burnetts' final argument is based on their contention that the medical-records request was inadmissible, because it should not have been disclosed to CARE Risk. In support of this argument, the Burnetts cite Prof. Cond. R. 1.8, Ohio case law regarding disclosure of confidential medical information, and the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). CARE Risk argues that the Burnetts waived this issue by failing to raise it in the trial court. The Burnetts contend that they raised the issue in their motion to intervene, which was filed before they were given leave to

intervene. The Burnetts also contend that they raised this issue in their objections to the magistrate's decision.

{¶ 78} The medical-records issue was mentioned in a motion that was filed before the Burnetts were granted leave to intervene. But the Burnetts failed to raise this issue when they moved for summary judgment after receiving permission to intervene. Failure to raise an issue in the trial court waives the argument on appeal. See, *e.g., Ingram v. Adena Health Sys.*, 149 Ohio App.3d 447, 452, 2002-Ohio-4878, 777 N.E.2d 901 (holding that failure to raise confidentiality of drug-treatment records waives the argument on appeal).

{¶ 79} Furthermore, the Burnetts' objections to the magistrate's decision list four specific objections, none of which includes the issue of the confidentiality of the medical records. Civ.R. 53(D)(3)(b)(ii) states: "An objection to a magistrate's decision shall be specific and state with particularity all grounds for objection." Civ.R. 53(D)(3)(b)(iv) also provides: "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)."

{¶ 80} Based on this rule, we refuse to consider issues that parties fail to raise in objecting to a magistrate's decision, unless plain error is demonstrated. See, e.g., *Maier v. Shields*, Miami App. No. 07–CA–21, 2008-Ohio-3874, 2008 WL 2941587, ¶ 50. The plain-error doctrine is not favored in civil appeals and "may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus.

{¶ 81} The case before us presents none of these exceptional circumstances. With regard to privilege, R.C. 2317.02(B)(1) provides:

{¶ 82} "The testimonial privilege established under this division does not apply, and a physician or dentist may testify or may be compelled to testify, in any of the following circumstances:

{¶ 83} "(a) In any civil action, in accordance with the discovery provisions of the Rules of Civil Procedure in connection with a civil action, or in connection with a claim under Chapter 4123. of the Revised Code, under any of the following circumstances:

{¶ 84} " * * *

{¶ 85} "(iii) If a medical claim, dental claim, chiropractic claim, or optometric claim, as defined in section 2305.113 of the Revised Code, an action for wrongful death, any other type of civil action, or a claim under Chapter 4123. of the Revised Code is filed by the patient, the personal representative of the estate of the patient if deceased, or the patient's guardian or other legal representative."

{¶ 86} By filing an action against Dr. Martin, and by intervening in the CARE Risk declaratory action against Dr. Martin, the Burnetts waived the medical privilege. In fact, the Burnetts attached an affidavit from their attorney to their motion to intervene that disclosed information about their attorney's medical-records inquiry to Dr. Martin. The affidavit indicated that the attorney (Dwight Brannon) had met with Iva Burnett in September 2005, regarding concerns she had surrounding the death of her husband, Floyd Burnett. The attorney also stated that as a result of the meeting, he had requested medical records from Dr. Martin in October 2005, in order to send the records to a qualified medical expert.

{¶ 87} Dr. Martin also testified that he had received the records request, and he did not assert a medical privilege as grounds for having the trial court reject the use of the letters sent by the Burnetts' attorney. There is nothing in this course of events to suggest exceptional circumstances that affect the basic integrity of the judicial process.

{¶ 88} Based on the above discussion, we conclude that the trial court erred in rendering summary judgment in favor of CARE Risk. The statements in the application are representations, not warranties. And there are genuine issues of material fact regarding Dr. Martin's alleged misstatements on the insurance application and other materials that were submitted to CARE Risk.

{¶ 89} Accordingly, the Burnetts' first assignment of error is sustained.

### III

{¶ 90} The Burnetts' second assignment of error is as follows:

{¶ 91} "The trial court erred in refusing to allow the defendants to intervene before the first hearing."

{¶ 92} Under this assignment of error, the Burnetts contend that they were prejudiced because they were not able to intervene in the declaratory-judgment action until six months after the preliminary-injunction hearing was held. They contend that they were necessary parties under Civ.R. 19.1 and that their interests were not effectively protected by Dr. Martin. In particular, the Burnetts contend that the trial court's determination in the preliminary-injunction action that Dr. Martin knowingly misrepresented information in his application "clouded" the case from that point.

{¶ 93} CARE Risk contends that the issue of the delay in ruling on the motion to intervene is not properly before us, because the decisions on intervention were interlocutory and were not incorporated into the final, appealable order in this case. The Burnetts respond by stating that there is no issue remaining before the trial court and that the trial court order overruling the objections decided all the remaining issues before the court. Consequently, the Burnetts contend, the final, appealable order incorporates all interlocutory orders, including the decisions on the motion to intervene.

{¶ 94} Our review of the file indicates that the Burnetts filed a motion to intervene in the action in May 2007 and they were permitted to intervene in June 2008. The delay in ruling on the motion was caused by the reassignment of the case to a new judge and the fact that the matter was temporarily assigned in the meantime to another judge, so that the preliminary-injunction motion could be expeditiously heard.

{¶ 95} After the Burnetts were permitted to intervene in June 2008, they filed an answer and a counterclaim. The first count of the counterclaim asserts a claim for declaratory judgment and contends that Dr. Martin's statements are not false and are not warranties justifying cancellation of coverage. The second count alleges that CARE Risk had caused or had participated in a breach of fiduciary duty regarding the Burnetts' rights to medical privacy under HIPAA and Ohio law. The Burnetts allege that they were damaged in an amount exceeding $25,000 as a result of this breach.

{¶ 96} Both the Burnetts and CARE Risk subsequently moved for partial summary judgment with respect to the issue of insurance coverage under the policy issued to Dr. Martin. The magistrate's decision and the trial court's decision overruling the objections to the magistrate's decision both state that judgment is being rendered in favor of CARE Risk and against Dr. Martin on the issue whether coverage under the CARE Risk policy is void ab initio. The decisions also both state that judgment is being rendered in favor of CARE Risk on the Burnetts' counterclaim for declaratory judgment. In addition, the trial court added a Civ.R. 54(B) finding, indicating that there was no just reason for delay.

{¶ 97} We note that the Burnetts state that all issues were resolved in the trial court. However, no dismissal entry has been filed that we are aware of, and count two of the Burnetts' counterclaim is apparently still pending in the trial court. No party has raised the issue whether a final, appealable order exists under R.C. 2505.02. However, before addressing the assignment of error, we first consider the issue whether a final, appealable order exists, because subject-matter jurisdiction "may not be waived or bestowed upon a court by the parties to the case." *State ex rel. White v. Cuyahoga Metro. Hous. Auth.* (1997), 79 Ohio

St.3d 543, 544, 684 N.E.2d 72. Appellate courts may therefore raise this issue on their own motion. Id.

{¶ 98} As pertinent here, R.C. 2505.02(B)(2) provides that an order is a final order that may be reviewed when it is "[a]n order that affects a substantial right made in a special proceeding or upon a summary application in an action after judgment." Declaratory-judgment proceedings are special proceedings, and the right to insurance coverage involves a substantial right. Furthermore, where claims remain pending, the order is appealable if the trial court also complies with Civ.R. 54(B) by noting that no just cause for delay exists. See, e.g., *Roberts v. Reyes*, Lorain App. No. 9CA009576, 2010-Ohio-1086, 2010 WL 1016116, ¶ 13, and *Braelinn Green Condominium Unit Owner's Assn. v. Italia Homes, Inc.*, Franklin App. No. 09AP–1144, 2010-Ohio-2371, 2010 WL 2162641, ¶ 12 (both holding that decisions on insurance coverage are final, appealable orders, if the trial court includes a Civ.R. 54(B) order). Accordingly, this appeal is from a final, appealable order and we have jurisdiction to hear the appeal.

{¶ 99} Although we hold that this case is properly before us, that holding does not address whether the intervention order is included in the present appeal. We conclude that the order may be considered as part of this appeal. "While App.R. 3(D) provides that appellant must include in the notice of appeal reference to the order from which the appeal is taken, appellant need not refer to every interlocutory order he wishes to challenge. Interlocutory orders are merged into the final judgment and can be appealed as part of the final judgment." *Siemasz-ko v. FirstEnergy Nuclear Operating Co.*, 187 Ohio App.3d 437, 441, 2010-Ohio-2121, 932 N.E.2d 414, ¶ 9. Accord, *Grover v. Bartsch*, 170 Ohio App.3d 188, 2006-Ohio-6115, 866 N.E.2d 547, ¶ 9.

{¶ 100} The final judgment in the case before us is the decision on the merits of the declaratory-judgment action. Because the interlocutory orders deferring a ruling upon and then ultimately granting the motion to intervene relate to that judgment, they are properly before us as part of this appeal.

{¶ 101} Nonetheless, the issue whether the trial court erred in delaying a ruling is moot. On remand, the Burnetts will be able to fully present their evidence and arguments to the trier of fact.

{¶ 102} Under the second assignment of error, the Burnetts also ask that we hold R.C. 2721.02, 2721.12, 2721.16, 3929.06, and all related sections unconstitutional to the extent that they permit insurers to obtain a declaratory judgment against an insured without the involvement of a tort victim. The Burnetts concede that they failed to raise this issue in the trial court. Again, this

argument is moot, and the matter can be raised on remand, if the Burnetts so desire.

{¶ 103} The Burnetts' second assignment of error is overruled as moot.

## IV

{¶ 104} The Burnetts' first assignment of error having been sustained and the second assignment of error having been overruled as moot, the judgment of the trial court is reversed, and this cause is remanded for further proceedings.

Judgment reversed,
and cause remanded.

GRADY and FROELICH, JJ., concur.