[Cite as *Nelson v. Colossal Constr. Co., Inc.*, 2017-Ohio-399.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| ROBERT NELSON | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 27145 |
| | : | |
| v. | : | Trial Court Case No. 2015-CV-1521 |
| | : | |
| COLOSSAL CONSTRUCTION | : | (Civil Appeal from |
| COMPANY, INC., et al. | : | Common Pleas Court) |
| | : | |
| *Defendants-Appellees* | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of February, 2017.

. . . . . . . . . . .

SAMUEL J. WARDEN, Atty. Reg. No. 0087918, 229 Dayton Street, Hamilton, Ohio 45011
    Attorney for Plaintiff-Appellant

NATALIE J. TACKETT, Atty. Reg. No. 0040221, Assistant Attorney General, Workers'
Compensation Section, 150 East Gay Street, 22nd Floor, Columbus, Ohio 43215
    Attorney for Defendant-Appellee

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Plaintiff-Appellant, Robert Nelson, appeals from a judgment rendered in favor of Defendants-Appellees, Colossal Construction Company, Inc. ("Colossal"), and Steve Buehrer, Administrator, Ohio Bureau of Worker' Compensation ("BWC"). In support of his appeal, Nelson contends that the trial court committed plain error by using incorrect diagnostic criteria and by finding that Nelson's doctors failed to perform any differential diagnoses in connection with Nelson's claim to add Complex Regional Pain Syndrome ("CRPS") as a covered condition. Additionally, Nelson contends that the trial court committed plain error by accepting as persuasive the testimony of an expert retained by the BWC.

{¶ 2} We conclude that no plain error occurred in the trial court. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} On April 18, 2011, Robert Nelson was injured while working as a construction worker for Colossal. As a result of a fall from a ladder, Nelson sustained a wound to his head and left ankle. His claim with the BWC was allowed for the following conditions: fracture of calcaneus-closed, left; open forehead wound; tarsal tunnel syndrome, left; post-traumatic arthropathy, left ankle; and depressive disorder.

{¶ 4} Following the accident, Nelson had several surgeries on his left foot. The first surgery, in late April 2011, was to correct the fracture. At that time, pins, screws, and a plate were used to hold Nelson's left heel together. Nelson was not permitted to put any pressure or weight on his foot for three months. After that, he had physical

therapy for a total of about six months. However, Nelson continued to have pain in his foot from the date of his injury. The pain never ended, despite medication, and Nelson also experienced numbness and swelling in his foot.

{¶ 5} Nelson's surgeon sent him for an EMG, which was performed on October 31, 2011, and suggested a condition called left tarsal tunnel syndrome. The tarsal tunnel is an opening in the foot and ankle that is bounded on one side by bone and by ligament and gristle on the other. A nerve passes through the tunnel, going to the top of the foot, into the inside of the foot, and down to the toes. If this nerve is irritated, it can cause a pins and needles sensation, can cause pain, and can also cause the muscle in that area to diminish if the nerve is not properly functioning. All these complaints are called tarsal tunnel syndrome. As was noted, this was one of several claims the BWC approved for Nelson.

{¶ 6} On May 8, 2012, Dr. Peters performed the following surgery on Nelson: a tarsal tunnel release, which released the ligament running over the artery and nerve in order to alleviate pressure on the nerve; removal of hardware from the left foot; and a subtalar joint fusion, which attempted to join two bones and have them grow one bone, to provide stability to the area. After that surgery, Nelson was placed in a foam cast and again had physical therapy. According to Nelson, when he complained that he still had pain and that something was wrong, Dr. Peters told him that everything had been fixed, and to "Man up." Dr. Peters then referred Nelson to Dr. Shahid, a board certified anesthesiologist and pain specialist.

{¶ 7} Dr. Shahid first saw Nelson on November 8, 2012. At that time, Nelson complained of constant pain, localized in the left ankle and consisting of all aspects of the

ankle and middle part of the foot, including the top, sole, and sides of the middle foot. Nelson described the pain as five or six on a scale of 10, worsened by any type of physical activity, and only mildly improved with Nelson's current medications, which consisted of Vicodin, Tramadol, and Lyrica (a nerve pain medication).

{¶ 8} Dr. Shahid diagnosed Nelson with Complex Regional Pain Syndrome, or CRPS, which he saw in about 5% of his patients. According to Dr. Randolph, who performed an independent medical examination of Nelson, the symptoms comprising CRPS had been labeled prior to 1994 as Reflex Sympathetic Dystrophy ("RSD"). The International Association for the Study of Pain ("IASP") developed a four-part diagnostic criteria in 1994 and promulgated it as a tool for assessing CRPS.

{¶ 9} Dr. Shahid indicated that CRPS is a constellation of symptoms, with no clear definition of the term. He stated that the diagnosis is one of exclusion, and that no one knows what causes CRPS. Usually, the injury leading to CRPS is a traumatic injury that causes a constellation of symptoms, including pain, swelling, and color changes. The pain can start immediately after a traumatic event, or not for a period of time. According to Dr. Shahid, the "Harlen criteria" are used to diagnose CRPS.[1]

{¶ 10} According to the Magistrate's Decision, Dr. Shahid described the Harden criteria in his deposition as follows:

> 1. The presence of an initiating noxious event or a cause of

---

[1] The proper term is "Harden," not "Harlen," as the magistrate noted in her decision. In his testimony, Dr. Shahid referred to a paper published in 2007, which suggested and proposed diagnostic criteria for CRPS. The magistrate referred to this paper in her decision, noting it was a 2007 paper written by Dr. Harden and three others entitled *Proposed New Diagnostic Criteria for Complex Regional Pain Syndrome.* Magistrate's Decision, Doc. #42, p. 16.

immobilization[;]

2. Continuing pain, allodynia, or hyperalgesia with which the pain is disproportionate to any inciting event[;]

3) Evidence at some time of edema, changes in skin blood flow, or abnormal sudomotor activity in the region of pain[;]

4) This diagnosis is excluded by the existence of conditions that would otherwise account for the degree of pain and dysfunction[.]

Magistrate's Decision, Doc. #42, p. 16.

**{¶ 11}** In a letter to the BWC, Dr. Shahid also provided the following other criteria for diagnosing CRPS:

1.   Continuing pain, which is disproportionate to any inciting event

2.   Must report at least one symptom in three of the four following categories

Sensory: Reports of hyperalgesia and/or allodynia

Vasomotor: Reports of temperature asymmetry and/or skin color changes and/or skin color asymmetry

Sudomotor/Edema:

Motor/Trophic: Reports of decreased range of motion and/or motor dysfunction (weakness, tremor, dystonia) and/or trophic changes (hair, nail, skin)

3. Must display at least one sign at time of evaluation in two or more of the following categories

Sensory: Evidence of hyperalgesia (to pinprick) and/or allodynia (to

light touch and/or deep somatic pressure and/or joint movement)

Vasomotor: Evidence of temperature asymmetry (>1°C) and/or skin color changes and/or asymmetry

Sudomotor/Edema: Evidence of edema and/or sweating changes and/or sweating asymmetry

Motor/Trophic: Evidence of decreased range of motion and/or motor dysfunction (weakness, tremor, dystonia) and/or trophic changes (hair, nail, skin)

4) There is no other diagnosis that better explains the signs and symptoms.

Magistrate's Decision, Doc. #42, p. 13.

{¶ 12} Allodynia is a painful response to a nonpainful stimulus. An example would be pain reported when a feather is brushed across a part of the body. Hyperalgesia (also called hyperthesia or hyperpathia by the witnesses) means that an individual has an exaggerated painful response to a painful stimulus. An example would be if someone says he or she has a terrible pain when touched by a pin.

{¶ 13} Dr. Shahid noted that Nelson complained of constant pain, as well as swollenness and discoloration of the foot. These were subjective complaints. Dr. Shahid's objective observations were that Nelson walked with a limp on the left, that bilateral inspection revealed a left foot deformity with atrophic changes (meaning the foot was smaller), and a somewhat shiny appearance that comes with edema, or swelling. There was also mottling, or a color change, of the left foot, and a colder left foot compared to the right. Dr. Shahid did not measure the temperature difference, nor did he order any

diagnostic testing.  He also did not discuss any differential diagnoses in his progress note.

**{¶ 14}** Based on his examination and Nelson's complaints, Dr. Shahid recommended that CRPS of the left lower extremity be added to Nelson's diagnosis related to his work-related injury.  On November 27, 2012, Nelson filed a C-86 motion with the BWC, asking that his claim be amended to include Complex Regional Pain Syndrome Left Lower Extremity.  Although a district hearing officer initially approved the amendment in April 2013, the order was vacated in May 2013.  The Industrial Commission then refused Nelson's further appeal on June 2013.  Subsequently, Nelson appealed to the Montgomery County Common Pleas Court.  After dismissing the case without prejudice in March 2014, Nelson refiled his appeal in March 2015.

**{¶ 15}** In the meantime, Nelson continued to treat with Dr. Shahid for about 19 months for pain management, but Dr. Shahid did not send Nelson for any diagnostic tests. Dr. Shahid then referred Nelson to Dr. LaBianco, who specialized in foot and ankle reconstruction.  At the time of his first visit with Dr. LaBianco in July 2014, Nelson was taking two pain medicines, Oxycodone and Tramadol, two nerve medicines, Gabapentin and Amitriptyline, and a depression and anxiety medicine, Effexor.  When Dr. LaBianco first saw Nelson, it was questionable whether the prior subtalar fusion done by Dr. Peters had taken.  Nelson's major complaints at that time were pain, numbness, and burning sensations in the foot.  A CT-scan was subsequently taken and confirmed that the subtalar joint was not fused.  Dr. LaBianco indicated that this could cause pain. Basically, while Nelson was walking, the bones continued to move around and grind.

**{¶ 16}** On December 12, 2014, Dr. LaBianco removed the hardware from Nelson's

foot, put in a hip graft, and performed another subtalar joint fusion. The hip graft was needed because Nelson was missing a lot of bone from the initial fracture. After this surgery, Nelson was required to wear an external fixator, similar to a halo for the head, on his leg to stabilize the bones. The external fixator was removed in February 2015, and Nelson again had physical therapy. Dr. LaBianco's fusion was successful, but Nelson continued to complain of pain.

{¶ 17} In January 2014, prior to Dr. LaBianco's surgery, Dr. Randolph performed an independent medical examination on Nelson. Dr. Randolph is an occupational physician and medical epidemiologist. After graduating from medical school in 1975, Dr. Randolph also obtained a Ph.D. in epidemiology in 2014, and chronic pain was the subject of his dissertation. Randolph is board-certified as an occupational physician. Occupational medicine deals with health problems in association with work activities.

{¶ 18} Dr. Randolph found no redness, swelling, or bruising of Nelson's feet, nor did he find any problem with the appearance of the skin, any mottling, or any brittleness of the toenail on the left foot. Dr. Randolph also found that Nelson had equal hair growth on both feet, equal nail growth on both feet, and equal temperature for both feet. The toenails on both feet were discolored, which Dr. Randolph found significant. This was suggestive of a metabolic, nutritional, or congenital process inconsistent with CRPS, which would have affected only the left foot, not both feet. Further, Nelson had a history of toenail infections in the past, preceding the workplace injury.

{¶ 19} In addition, Dr. Randolph found slight swelling of the left ankle, which he said would not be unusual for the nature of Nelson's prior trauma. Dr. Randolph also found that Nelson's left calf was about one inch smaller than the right calf. This was

significant because it indicated Nelson was not using his left leg as actively as his right leg. Again, this was not an unusual finding, given the nature of Nelson's injury.

{¶ 20} Dr. Randolph found that Nelson's range of motion was diminished a bit on his left. He again stated this was not unexpected given the injury, but found significant the fact of equal shoe wear. According to Dr. Randolph, this indicated that Nelson was walking normally most of the time. Dr. Randolph additionally found no evidence of allodynia or hyperpathia, which are two symptoms reportedly associated with CRPS.

{¶ 21} Based on his examination of Nelson and review of the medical records, Dr. Randolph concluded that Nelson did not suffer from CRPS and that Nelson's subjective complaints were consistent with the conditions that had already been allowed by the BWC. By the time of his trial deposition, Dr. Randolph had reviewed additional medical records for Nelson, including those pertaining to Dr. LaBianco's subsequent surgery and treatment. Dr. Randolph adhered to his prior conclusions about Nelson.

{¶ 22} Trial was held before a magistrate on December 16, 2015. At that time, Nelson testified. The magistrate also was provided with video and transcripts of depositions of Dr. Shahid, Dr. LaBianco, and Dr. Randolph, which had been taken, respectively, on January 27, 2014, November 30, 2015, and December 7, 2015. Before the magistrate issued a decision, the case was administratively transferred to another magistrate. The parties then consented to having the magistrate base her decision on a review of the evidence that had already been submitted.

{¶ 23} On April 28, 2016, the magistrate issued a decision concluding that Nelson failed to establish that he had CRPS. Nelson did not file objections to the magistrate's decision. As a result, the trial court adopted the magistrate's decision on May 16, 2016,

and granted judgment in favor of BWC and Colossal. Nelson now appeals from the judgment of the trial court.


II. Alleged Plain Error in Using Incorrect Diagnostic Criteria

{¶ 24} Nelson's First Assignment of Error states that:

The Magistrate Committed Plain Error by Basing the Decision on an Incorrect Diagnostic Criteria that Was Not Used by Any Party or Expert Witness.

{¶ 25} Under this assignment of error, Nelson contends that the magistrate used an incorrect diagnostic standard. Specifically, the magistrate stated that the fourth Harden criteria requires that "[t]his diagnosis [of CRPS] is excluded by the existence of other conditions that would otherwise account for the degree of pain and dysfunction[.]" Nelson Brief, pp. 8-9, quoting Magistrate's Decision, Doc. #42, p. 16. According to Nelson, Dr. Shahid did not use this standard, and the fourth criteria of the Harden standard instead requires that "[t]here is no other diagnosis that better explains the signs and symptoms." Nelson argues that using an incorrect standard in rendering a decision was plain error because no expert witness used this standard. In response, the BWC contends that the two standards essentially mean the same thing.

{¶ 26} Normally, "[a]n appeal from the Industrial Commission to a trial court under R.C. 4123.512 regarding a claimant's right to participate in the workers' compensation scheme requires a de novo determination of matters of law and fact." (Citations omitted.) *Steele v. Crawford Machine, Inc.*, 184 Ohio App.3d 45, 2009-Ohio-2306, 919 N.E.2d 758, ¶ 11 (3d Dist.). "Upon further appeal, review of the trial court's decision is limited, and

'[i]f the evidence before that [trial] court is sufficient to support the result reached, [the reviewing] court will not substitute its judgment.' " *Id.* at ¶ 12, quoting *Oswald v. Connor*, 16 Ohio St.3d 38, 42, 476 N.E.2d 658 (1985). (Other citations omitted.) However, in the case before us, our review is limited to plain error, because Nelson failed to object to the magistrate's decision.

{¶ 27} Civ.R. 53(D)(3)(b)(i) allows parties to file written objections to a magistrate's decision within 14 days after the decision has been filed. Civ.R. 53(D)(3)(b)(iv) further provides that:

> Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b).

{¶ 28} We have said many times that if issues are not raised in objections to a magistrate's decision, we will not consider them on appeal "unless plain error is demonstrated." (Citation omitted.) *Care Risk Retention Group v. Martin*, 191 Ohio App.3d 797, 2010-Ohio-6091, 947 N.E.2d 1214, ¶ 80 (2d Dist.). Notably, "[t]he plain-error doctrine is not favored in civil appeals and 'may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.' " *Id.*, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus.

{¶ 29} After reviewing the record and the magistrate's decision, we find that the alleged error does not fit the requirements for applying the plain error doctrine. As is evident from the criteria cited by the magistrate, the standard the magistrate mentioned is one of two sets of criteria Dr. Shahid discussed. The difference between them is that the fourth criteria in one set provides instead that "[t]here is no other diagnosis that better explains the signs and symptoms." Magistrate's Decision, Doc. #42, p. 13.

{¶ 30} While this is a slightly different formulation of the other standard, we agree with BWC that the standards say essentially the same thing, and that the magistrate did not commit plain error, or any error, by referring to the other standard. Furthermore, examination of the magistrate's decision indicates that this mention of the other standard occurred during a 35-page discussion of the facts in the case, not in the magistrate's conclusions of law and analysis.

{¶ 31} Nelson argues that the two standards are very different and that Dr. Randolph's criticism of Dr. Shahid's diagnosis is based almost entirely on the argument that the fourth criteria was improperly followed. Again, we find no significant difference in the standards. It is true that Dr. Randolph criticized Dr. Shahid for failing to perform any diagnostic workups, for failing to rule out any differential diagnoses, for failing to even follow the IASP's own guidelines, and for failing to even look for any other condition that could have caused the problem. Randolph Deposition, Doc. # 34, pp. 58-60 and 73-74. It would be difficult to conclude that no other diagnosis "better explains" the signs and symptoms, when nothing has been done to investigate or exclude other causes.

{¶ 32} For example, Dr. Randolph indicated that abnormal blood sugar and alcoholism are high on the list of conditions that could cause the pertinent symptoms, as

are autoimmune conditions, hepatitis, renal failure, and hyperlipidemia (an abnormally high concentration of fats or lipids in the blood). These are not matters that can be ascertained by observation, which is all that Dr. Shahid did. Dr. Randolph indicated that a number of very commonly experienced clinical problems could present the same way, with a painful extremity and altered sensation, and so on. These potential causes were simple to check, but, again, this was not done. For example, Dr. Randolph noted that Nelson had a prior history of alcohol issues and that alcohol is notorious for producing peripheral neuropathies. Again, no testing was done to exclude any possibilities.

{¶ 33} Similarly, the magistrate's decision in favor of BWC was based on the fact that no differential diagnoses were performed, and that both "Drs. Randolph and Shahid agree that CRPS is a diagnosis of exclusion." Magistrate's Decision, Doc. #42, p. 40. We agree with the magistrate and find no error or plain error.

{¶ 34} In this regard, Dr. Shahid specifically agreed with the statements that "CRPS is a diagnosis of ruling out other diagnoses * * *," and that "CRPS is a diagnosis of exclusion." Shahid Deposition, Doc. #30, pp. 50 and 73. This is consistent with Dr. Randolph's testimony. Dr. Shahid also agreed that "it's essential to determine that other conditions in the differential diagnoses of extremity pain be excluded before a diagnosis of CRPS be made," and that "[e]xamples include sprains, fractures, peripheral neuropathies, inflammatory and rheumatological disorders, and fractious disorder." *Id.* at pp. 74-75. Despite this, Dr. Shahid diagnosed Nelson with CRPS during the very first office visit and did not mention any potential differential diagnoses. *Id.* at p. 77. He also never, thereafter, conducted any diagnostic testing.

{¶ 35} Accordingly, we find no error, let alone, plain error, in the magistrate's

mention of diagnostic standards, and overrule the First Assignment of Error.

### III.   Factual Finding Regarding Performance of Differential Diagnoses

**{¶ 36}** Nelson's Second Assignment of Error states that:

[The] Magistrate's Finding of Fact that No Differential Diagnoses Was Performed Was Plain Error.

**{¶ 37}** Under this assignment of error, Nelson contends that the magistrate's finding that no differential diagnoses were performed was plain error.   In particular, Nelson points to Dr. Shahid's testimony that he ruled out other potential causes of Nelson's pain symptoms.   Nelson also notes Dr. LaBianco's observation that Nelson's trauma was properly repaired and was not causing his continued symptoms.

**{¶ 38}** As support for this argument, Nelson cites authority indicating that plain error is not committed when a ruling is supported by witness testimony.   See *Hardy v. Hardy*, 7th Dist. Harrison No. 14 HA 6, 2016-Ohio-1009, ¶ 29 (rejecting a claim of plain error where the trial court's decision to order a mental health exam of a divorce litigant was supported by testimony from the guardian ad litem and a witness who had witnessed abusive behavior by the litigant).

**{¶ 39}** Contrary to Nelson's claims, there is witness testimony supporting the magistrate's decision.   As was noted in the discussion of the First Assignment of Error, Dr. Randolph testified that no proper differential diagnoses and workups were done.

**{¶ 40}** In response to cross-examination about the lack of mention of any differential diagnoses in his initial progress note, Dr. Shahid did indicate that he did not see issues in Nelson related to arthritis, a somatoform disorder, neuropathy, and some

other differential diagnoses (not an exclusive list) that had been mentioned as examples by defense counsel. *See* Shahid Deposition, Doc. #30 at pp. 77-79. Dr. Shahid then stated that there was no need to talk about differential diagnoses when CRPS is "pretty obvious." *Id.* at p. 79.

{¶ 41} The magistrate concluded that Dr. Shahid was not an effective witness, that Dr. Shahid's CRPS diagnosis was "suspect at best," and that Dr. Shahid failed to provide clear answers at many points. Magistrate's Decision, Doc. #42, p. 40. After making these observations, the magistrate noted that "[f]or example, Dr. Shahid's response to the question of whether he diagnosed Plaintiff with CRPS during Plaintiff's initial consultation with Dr. Shahid was particularly evasive." *Id.* The magistrate also found Dr. LaBianco's testimony unpersuasive, particularly since Dr. LaBianco admitted that he did not treat Nelson for CRPS. *Id.*[2]

{¶ 42} In *Finley v. YWCA*, 2d Dist. Montgomery No. 20088, 2004-Ohio-3092, we commented that "[s]ince the trier of facts' decision was based upon a credibility call of the witnesses who testified at the hearing, it would be practically impossible to find a plain error in this proceeding." *Id.* at ¶ 4. *See also Townsend v. Phommarath*, 10th Dist. Franklin No. 10AP-598, 2011-Ohio-1891, ¶ 12, and *State v. Cook*, 10th Dist. Franklin Nos. 09AP-316, 09AP-317, 2010-Ohio-2726, ¶ 44 (finding that challenges to credibility determinations do not rise to level of plain error). This is consistent with the rule that "[t]he credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve." (Citation omitted.) *Jenkins v. Jenkins*, 2012-Ohio-4182,

---

[2] In addition, Dr. LaBianco testified that Nelson's symptoms (edema, swelling, and nerve pain) could have been caused by other conditions besides CRPS. LaBianco Deposition, Doc. #32, pp. 61-62. Again, no tests were done to discover other potential causes.

975 N.E.2d 1060, ¶ 19 (2d Dist.)

{¶ 43} Because the fact-finder is entitled to deference concerning credibility determinations, and because, as was noted, Dr. Randolph's testimony supports the magistrate's decision, the Second Assignment of Error is overruled. This case does not represent the extremely rare situation where error affects the fairness or integrity of the judicial process. *Care Risk Retention Group*, 191 Ohio App.3d 797, 2010-Ohio-6091, 947 N.E.2d 1214, at ¶ 80. In fact, we find no error.


IV. Dr. Randolph's Testimony

{¶ 44} Nelson's Third Assignment of Error states that:

The Magistrate Committed Plain Error in Accepting Dr. Randolph's Testimony as Persuasive Because Dr. Randolph Effectively Does Not Agree With Any Diagnosis of Complex Regional Pain Syndrome.

{¶ 45} Under this assignment of error, Nelson argues that the magistrate committed plain error by relying on Dr. Randolph's testimony, because Dr. Randolph allegedly does not believe that any patient should be diagnosed with CRPS. We disagree that plain error occurred.

{¶ 46} The magistrate noted that "[i]t is quite apparent that Plaintiff's and the BWC's experts have philosophical differences regarding CRPS and it is a fair statement that Dr. Randolph is skeptical of virtually all CRPS diagnoses." Magistrate's Decision, Doc. #42, p. 39. The fact that Dr. Randolph was "skeptical" did not disqualify him from offering opinions, nor did it prevent the magistrate from accepting his conclusions.

{¶ 47} Furthermore, Dr. Randolph did not say that he would never accept a

diagnosis of CRPS. In fact, he specifically disagreed with an assertion that he had never examined a patient with an alleged CRPS diagnosis that he agreed with. Randolph Deposition, Doc. #34 at p. 83. In this context, the following further exchange occurred:

> Q. So since the 1980s since you've been seeing patients and examining patients like Mr. Nelson with the alleged diagnosis of CRPS or its older name –
>
> * * *
>
> Q. – RSD, how many of those cases have you agreed with the diagnosis of CRPS or RSD?
>
> A. Since – that's – I don't know. I mean, that was years ago. I remember a handful, but this is not a very common presentation.

*Id.* at p. 84.

{¶ 48} It is true that Dr. Randolph continued the above statement with the observation that "And more recently I have seen – when you start digging into these people, you find out that there's an underlying process. If you treat the underlying pathologic process, they're going to get well." *Id.* As the magistrate said, Dr. Randolph was skeptical about CRPS.

{¶ 49} As was noted, Dr. Randolph was entitled to state his medical opinion, part of which was based on his review of 927 cases in the Ohio Workers' Compensation database between 2001 and 2011. In these cases, the claimants had been diagnosed with CRPS. After reviewing the cases, Dr. Randolph found that in only one case had a basic differential diagnosis been completed, despite the fact that IASP's own standards require exploration of other causes for the symptoms. *Id.* at 34-36.

**{¶ 50}** Dr. Randolph also indicated that CRPS is a controversial condition and that published reports on a differential diagnosis of CRPS were basically non-existent. *Id.* at 34-35. In fact, the lack of validation in medical literature was one of the reasons that the initial criteria adopted for diagnosing CRPS were subsequently modified. *See* Harden, Bruehl, Hicks, & Wilson, *Proposed New Diagnostic Criteria for Complex Regional Pain Syndrome*, Vol. 8, No. 4, Pain Medicine, 326, 327-329 (2007).[3]

**{¶ 51}** Experts other than Dr. Randolph have indicated that CRPS is an "unusual diagnosis" and that it is controversial. *See Wood v. Gutierrez*, 3d Dist. Hancock No. 5-06-10, 2006-Ohio-5384, ¶ 25 and 31 (plaintiff's expert admitted CRPS can be somewhat controversial; defense expert stated the diagnosis is "unusual"); *Hickok-Knight v. Wal-Mart Stores, Inc.*, 170 Wash.App. 279, 312, 284 P.3d 749 (Wash.App.2012) (experts from both sides stated that "CRPS was as 'murky' of a condition as headaches, and was 'fairly controversial and unclear in any case' "); *Lake v. Morphew*, Ca. 1st Dist., Div.3 No. A145121, 2016 WL 6082024, *3 (Oct. 18, 2016) (plaintiff's expert neurologist, who had diagnosed plaintiff with CRPS, agreed that "CRPS is a misunderstood and controversial condition whose diagnosis depends heavily on the patient's credibility"); *Canion v. United States*, W.D. Texas No. EP-03-CA-0347-FM, 2005 WL 1514045, *5 (June 21, 2005) (noting "overwhelming credible evidence at trial indicated that CRPS is not well understood within the medical community, and its causes are numerous and extremely complex"); *Giordano v. Sherwood*, 968 A.2d 494, 500 (D.C.App.2009) (plaintiff's expert agreed that "RSD * * * 'is not and never has been well understood by the medical

---

[3] This bears the same title as the paper discussed by the magistrate and referenced in fn. 1, supra.

professionals.' "); *Miller v. W.C.A.B. (Airborne Freight)*, 817 A.2d 1200, 1202 (Pa. Commw. Ct.2003) (plaintiff's expert described RSD "as a poorly understood syndrome"); *Labor Ready v. Mogensen*, 275 Or.App. 491, 497-498, 365 P.3d 623 (Or.App.2015) (noting that "[t]here appears to be significant controversy in the medical community, between specialists in pain management and specialists in neurology, concerning the etiology, nomenclature, and therapies for symptoms like claimant's [alleged CRPS symptoms] * * * ").

{¶ 52} Nonetheless, Dr. Randolph's criticism of Dr. Shahid's diagnosis was that no attempt was made to even investigate other causes, which conflicts with the criteria upon which Dr. Shahid agreed, i.e., that "CRPS is a diagnosis of exclusion * * *." Shahid Deposition, Doc. #30 at p. 73. As Dr. Randolph stated, "If you don't look, you cannot satisfy criteria for which is mandated, that is you can't say there is no other explanation for this because you haven't looked." Randolph Deposition, Doc. #34 at p. 36.

{¶ 53} Accordingly, the magistrate did not commit plain error in accepting Dr. Randolph's testimony. As with the other assignments of error, this is not the rare case where plain error has affected the fairness or integrity of the judicial process. *Care Risk Retention Group*, 191 Ohio App.3d 797, 2010-Ohio-6091, 947 N.E.2d 1214, at ¶ 80.

{¶ 54} Based on the preceding discussion, the Third Assignment of Error is overruled.


V.  Conclusion

{¶ 55} All of Nelson's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, P.J. and FROELICH, J., concur.

Copies mailed to:

Samuel J. Warden
Natalie J. Tackett
Colossal Construction Co., Inc.
Hon. Timothy N. O'Connell